MCKENZIE CZABAJ, AZ # 036711
DAVID A. CHAMI, AZ # 027585
DANIEL COHEN, # 032552
**CONSUMER ATTORNEYS**
8245 N. 85th Way
Scottsdale, Arizona 85258
T: (480) 626-2376
E: mczabaj@consumerattorneys.com

*Attorneys for Plaintiff*
Brian D'Amico

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA
TUCSON DIVISION

| | |
|---|---|
| Brian D'Amico<br>  Plaintiff,<br>-against-<br>SafeRent Solutions, LLC<br>  Defendant. | Case No.:<br><br>**JURY TRIAL DEMANDED** |

# COMPLAINT

Brian D'Amico ("Plaintiff" or "Mr. D'Amico") by and through his counsel brings the following Complaint against SafeRent Solutions, LLC ("Defendant" or "SafeRent") for violations of the federal Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681, *et seq.*, arising out of a tenant screening report that Defendant published to Plaintiff's potential landlord, which falsely portrayed Plaintiff as a sex offender and included multiple criminal charges which do not belong to Plaintiff.

## INTRODUCTION

1. This is an individual action for damages, costs, and attorney's fees brought against Defendant pursuant to the Fair Credit Reporting Act, 15 U.S.C. §§ 1681, *et seq.* ("FCRA").

2. Defendant is a consumer reporting agency ("CRA") that compiles and maintains files on consumers on a nationwide basis. It sells consumer reports, also known as tenant screening reports, generated from its database and furnishes these tenant screening reports to mortgage brokers, landlords, and property management companies who use the reports to make decisions regarding prospective borrowers and tenants.

3. Defendant assembled and published an inaccurate tenant screening report to Plaintiff's prospective landlord, which included ninety-two (92) misdemeanor and felony charges (and convictions), including highly stigmatizing convictions for criminal charges such as sexual assault, risk of injury to child, and interfering with an officer/resisting, and more, which do not belong to Plaintiff.

4. Plaintiff's prospective landlord denied Plaintiff's housing application after receiving the tenant screening report from Defendant, in which Defendant published more than ninety criminal charges (and convictions) which do not belong to Plaintiff.

5. After Plaintiff disputed the inaccurate, stigmatizing information contained within the tenant screening report, Defendant failed to conduct a reasonable reinvestigation, or any investigation at all, and accordingly failed to delete all of the disputed information that did not belong to Plaintiff.

6. In fact, after allegedly reinvestigating Plaintiff's dispute, rather than deleting *any* of the ninety-two (92) inaccurate entries on Plaintiff's background check, Defendant deleted only *one* entry, a fare violation that *does* belong to Plaintiff.

7. Defendant's inaccurate reporting could have easily been avoided had Defendant performed a cursory review of the widely available underlying public court records pertaining to the criminal records prior to publishing the information to Plaintiff's prospective landlord.

8. Defendant does not employ reasonable procedures to assure the maximum possible accuracy of the information it reports regarding consumers. Defendant's failure to employ reasonable procedures resulted in Plaintiff's report being grossly inaccurate.

9. Defendant committed these violations pursuant to its standard policies and practices, which harm innocent consumers seeking housing by prejudicing their prospective landlords with inaccurate information.

10. Defendant's inaccurate report cost Plaintiff the ability to rent an apartment unit that was suitably accommodating of his needs, causing him physical injury as a result of emotional distress, embarrassment, inconvenience, anxiety, fear of homelessness, and financial loss.

11. As a result of Defendant's violations of the FCRA, Plaintiff has suffered a range of actual damages including, without limitation, loss of housing opportunities; loss of time trying to correct the tenant screening report; the expenditure of labor and effort disputing and trying to correct the inaccurate reporting; wasted money; damage to his reputation; loss of sleep; lasting psychological damage; loss of capacity for enjoyment of life; and emotional distress, including mental anguish, anger, anxiety, fear, frustration, humiliation, and embarrassment.

12. As a result of Defendant's conduct, action, and inaction, Plaintiff brings claims against Defendant for failing to follow reasonable procedures to assure maximum possible accuracy based on 15 U.S.C. § 1681e(b) of the FCRA and for failing to conduct a reasonable reinvestigation to determine whether the information Plaintiff disputed – namely that which did not belong to Plaintiff – was inaccurate and for failing to delete the disputed information from the tenant screening report, in violation of the FCRA, 15 U.S.C. § 1681i.

**PARTIES**

13. Brian D'Amico ("Plaintiff" or "Mr. D'Amico") is a natural person residing in Tucson, Arizona, and is a "consumer" as that term is defined in 15 U.S.C. § 1681a©.

14. Defendant SafeRent Solutions, LLC ("Defendant" or "SafeRent") is a Delaware corporation doing business throughout the United States, including the State of Arizona and in this District, and has a principal place of business located at 3001 Hackberry Road, Irving, Texas 75063. SafeRent can be served through its registered agent Corporation Service Company at 251 Little Falls Drive, Wilmington, Delaware 19808.

15. Among other things, Defendant sells consumer reports, often called tenant screening reports, to mortgage brokers, property management companies, and landlords for their use in deciding whether to rent or otherwise offer housing to a prospective tenant. These reports are provided in connection with a business transaction initiated by the consumer.

16. Defendant is a consumer reporting agency as defined in 15 U.S.C. § 1681a(f) because for monetary fees, it regularly engages in the practice of evaluating and/or assembling information on consumers for the purpose of furnishing consumer reports for tenant screening purposes to third parties, and uses interstate commerce, including the Internet, for the purpose of preparing and furnishing such consumer reports.

**JURISDICTION AND VENUE**

17. This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p, which allows claims under the FCRA to be brought in any appropriate court of competent jurisdiction.

18. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

**STATUTORY BACKGROUND**

19. Enacted in 1970, the FCRA's passage was driven in part by two related concerns: first, that consumer reports were playing a central role in people's lives at crucial moments, such as when they applied for a job or credit, and when they applied for housing. Second, despite their importance, consumer reports were unregulated and had widespread errors and inaccuracies.

20. While recognizing that consumer reports play an important role in the economy, Congress wanted consumer reports to be "fair and equitable to the consumer" and to ensure "the confidentiality, accuracy, relevancy, and proper utilization" of consumer reports. 15 U.S.C. § 1681.

21. Congress, concerned about inaccuracies in consumer reports, specifically required consumer reporting agencies to follow "reasonable procedures to assure maximum possible accuracy" in consumer reports. 15 U.S.C. § 1681e(b).

22. Consumer reports that contain factually incorrect information which does not belong to the consumer at issue are neither maximally accurate nor fair to the consumers who are the subjects of such reports.

### THE FCRA'S PROTECTIONS FOR HOUSING APPLICANTS

23. Despite its name, the Fair Credit Reporting Act covers more than just credit reporting, it also regulates tenant screening reports like the one Defendant prepared in Plaintiff's name.

24. The FCRA provides a number of protections for housing applicants who are the subject of tenant screening reports for the purpose of securing housing and credit.

25. In the parlance of the FCRA, tenant screening reports are "consumer reports," and providers of tenant screening reports, like Defendant, are "consumer reporting agencies." 15 U.S.C. §§ 1681a(d) and (f).

26. The FCRA imposes duties on consumer reporting agencies to assure that consumer reports are accurate and that "consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy." 15 U.S.C. § 1681.

27. Under 15 U.S.C. § 1681e(b), consumer reporting agencies are required "to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

28. Defendant disregarded its duties under the FCRA with respect to Plaintiff's tenant screening report.

### DEFENDANT'S ILLEGAL BUSINESS PRACTICES

29. Over the past 15 years, there has been increased collection and aggregation of consumer data, including criminal records. As a result of the increasing availability of this data, there has been a boom in the tenant screening industry.

30. Tenant Screening Reports are generally created by running automated searches through giant databases of aggregated criminal record data. The reports are created and disseminated with little to no manual, in-person review, and the underlying court records are rarely directly reviewed in creating tenant screening reports.

31. Tenant screening companies, like Defendant, collect millions of records from a number of sources with data from county, state, and federal level sources. The data included on the reports is often not obtained directly from court records on an individual basis but instead is purchased in bulk or scraped from court websites.

32. Given that Defendant is in the business of selling tenant screening reports, Defendant should be well aware of the FCRA and the attendant harm to consumers for reporting inaccurate or outdated information.

33. Defendant places its business interests above the rights of consumers and reports such inaccurate information because it is cheaper for Defendant to produce reports containing information that is inaccurate and incomplete than it is for Defendant to exert proper quality control over the reports prior to their being provided to Defendant's customers.

34. Defendant reports such erroneous and incomplete information because it wants to maximize the automation of its report creation process, thereby saving the costs associated with conducting the additional review necessary to remove the inaccurate or out-of-date entries.

35. Defendant charges its customers the same price for reports that are grossly inaccurate as it does for accurate reports.

36. Appropriate quality control review of Plaintiff's report would have made clear that Defendant was reporting information that did not belong to Plaintiff.

## FACTS
**Plaintiff Applies for an Apartment with Raintree Apartments**

37. In or around May 2023, Plaintiff began searching for a new apartment in Tucson.

38. Plaintiff was searching for a new apartment because his existing apartment was in terrible condition and his landlord 'refused to make necessary repairs.

39. Specifically, Plaintiff was searching for an apartment that would accept convicted felons.

40. In or around late May 2023, Plaintiff searched for and found a suitable apartment: Raintree Apartments ("Raintree").

41. Prior to applying, Plaintiff confirmed that Raintree accepted convicted felons and that his own criminal records would not be an issue.

42. On or about May 23, 2023, Plaintiff applied to Raintree and submitted the required application fee.

**Defendant Published an Inaccurate Tenant Screening Report to Raintree**

43. Raintree contracted with Defendant to conduct tenant screening reports on prospective tenants to determine whether the prospective tenant is eligible to rent an apartment.

44. On or about May 23, 2023, Defendant sold a tenant screening report about Plaintiff to Raintree, wherein Defendant published information including a compilation of Plaintiff's credit history and criminal history.

45. The tenant screening report, identified as Lease Recommendation by Defendant, is a consumer report regulated by the FCRA.

46. Within that tenant screening report, Defendant published inaccurate information about Plaintiff.

47. Specifically, the "MULTI-STATE PLUS CRIMINAL SEARCH REPORT" section of the tenant screening report included ninety-two (92) criminal charges (and convictions) from Connecticut, which do not belong to Plaintiff.

48. The inaccurate reporting included the following:[1]

---

[1] Plaintiff acknowledges that the below listed case numbers are associated with Plaintiff. However, the listed charges were *not* brought against Plaintiff. It is unclear how Defendant came to associate these charges with Plaintiff's own criminal cases.

- 7 -

**Case Number S20N-CR-99-0085473S:**
1. a misdemeanor conviction for "Disorderly Conduct" with a disposition date of August 23, 1999;
2. A felony conviction for "Sexual Assault 1st Degree" with a disposition date of August 23, 1999;

**Case Number S20N-CR-04-0103837S:**
3. A felony conviction for "Failure to Appear 1st Degree" with a disposition date of February 7, 2005;
4. A charge for "Violate Conditional Discharge" with a disposition date of February 7, 2005
5. A felony conviction for "Possession of Narcotics" with a disposition date of February 7, 2005;
6. A misdemeanor conviction for "Use Motor Vehicle WO Permission" with a disposition date of February 5, 2007;
7. A misdemeanor conviction for "Breach of Peace 2nd Degree" with a disposition date of February 7, 2005;
8. A conviction for "Violation of Probation" with a disposition date of February 7, 2005;
9. A misdemeanor conviction for "<$500 On Revoked Payment Card" with a disposition date of February 7, 2005;
10. A misdemeanor charge for "Use Motor Vehicle WO Permission" with a disposition date of February 7, 2005;
11. A misdemeanor conviction for "IL Take Payment Card" with a disposition date of February 7, 2005;
12. A conviction for "Creating a Public Disturbance" with a disposition date of February 7, 2005;
13. A felony conviction for "Sale of Controlled Substance" with a disposition date of February 7, 2005;
14. A misdemeanor conviction for "interfere with Officer/Resisting" with a disposition date of February 7, 2005;
15. A misdemeanor conviction for "Failure to Appear 2nd Degree" with a disposition date of February 7, 2005;

**Case Number S01S-CT-00-0131916S:**
16. A misdemeanor charge for "Criminal Mischief 3rd Degree" with a disposition date of October 26, 2004;
17. A misdemeanor conviction for "Larceny 6th Degree" with a disposition date of October 26, 2004;
18. A misdemeanor conviction for "Assault 3rd Degree" with a disposition date of October 26, 2004;
19. A misdemeanor conviction for "Criminal Mischief 3rd Degree" with a disposition date of October 26, 2004;
20. A conviction for "Creating a Public Disturbance" with a disposition date of October 26, 2004;

21. A felony conviction for "Sale of Hallucinogen/Narcotic" with a disposition date of October 26, 2004;
22. A misdemeanor charge for "Larceny 6th Degree" with a disposition date of October 26, 2004;
23. A misdemeanor charge for "Assault 3rd Degree" with a disposition date of October 26, 2004;
24. A misdemeanor conviction for "Assault 3rd Degree" with a disposition date of October 26, 2004;

**Case Number S01S-CT-00-0131946S:**
25. A misdemeanor conviction for "Larceny 6th Degree" with a disposition date of October 26, 2004;
26. A conviction for "Creating a Public Disturbance" with a disposition date of October 26, 2004;

**Case Number F02B-CR-97-0135517S:**
27. A conviction for "Violation of Probation" with a disposition date of January 26, 1998;
28. A felony conviction for "Burglary 3rd Degree" with a disposition date of January 26, 1998;
29. A misdemeanor conviction for "Breach of Peace 2nd Degree" with a disposition date of January 26, 1998;
30. A felony charge for "Burglary 3rd Degree" with a disposition date of January 26, 1998;
31. A felony conviction for "Carrying Pistol WO Permit" with a disposition date of January 26, 1998;
32. A felony conviction for "Stealing Firearm" with a disposition date of January 26, 1998;
33. A conviction for "Violation of Probation" with a disposition date of January 26, 1998;
34. A misdemeanor conviction for "Larceny 6th Degree" with a disposition date of January 26, 1998;[2]
35. A misdemeanor conviction for "Larceny 6th Degree" with a disposition date of January 26, 1998;

**Case Number F02B-CR-98-0143581S:**
36. A conviction for "Violation of Probation" with a disposition date of October 23, 1998;
37. A conviction for "Creating a Public Disturbance" with a disposition date of October 23, 1998;

---

[2] Plaintiff acknowledges that he was convicted of one count of misdemeanor "Larceny 6th Degree" in association with case number F02B-CR-97-0135517S. However, Defendant's reporting made it appear as though he were convicted of three counts of misdemeanor "Larceny 6th Degree" which is not true.

- 9 -

38. A conviction for "Violation of Probation" with a disposition date of October 23, 1998;
39. A misdemeanor conviction for "Cruelty to Animals" with a disposition date of October 23, 1998;
40. A misdemeanor conviction for "FLR Respond- Payable Violation" with a disposition date of October 23, 1998;
41. A conviction for "Creating a Public Disturbance" with a disposition date of October 23, 1998;
42. A misdemeanor conviction for "Failure to Appear 2nd Degree" with a disposition date of October 23, 1998;
43. A misdemeanor charge for "Larceny 5th Degree" with a disposition date of October 23, 1998;
44. A felony charge for "Burglary 3rd Degree" with a disposition date of October 23, 1998;
45. A conviction for "Violation of Probation" with a disposition date of October 23, 1998;
46. A misdemeanor conviction for "Assault 3rd Degree" with a disposition date of October 23, 1998;
47. A misdemeanor conviction for "Unemployment Comp Fraud < $500" with a disposition date of October 23, 1998;
48. A misdemeanor conviction for "Larceny 5th Degree" with a disposition date of October 23, 1998;
49. A misdemeanor conviction for "Larceny 5th Degree" with a disposition date of October 23, 1998;
50. A felony conviction for "Sale of Hallucinogen/Narcotic" with a disposition date of October 23, 1998;
51. A felony conviction for "Asslt PB Sfty/EMT/Transt/Hlth" with a disposition date of October 23, 1998;
52. A felony conviction for "Burglary 3rd Degree" with a disposition date of October 23, 1998;
53. A conviction for "Violation of Probation" with a disposition date of October 23, 1998;
54. A felony conviction for "Sale of Hallucinogen/Narcotic" with a disposition date of October 23, 1998;

**Case Number F02B-CT-98-0145613S:**
55. A felony charge for "Larceny 1st Degree" with a disposition date of January 19, 1999;
56. A felony conviction for "Larceny 1st Degree" with a disposition date of January 19, 1999;
57. A conviction for "Violation of Probation" with a disposition date of January 19, 1999;
58. A misdemeanor conviction for "Assault 3rd Degree" with a disposition date of January 19, 1999;

59. A misdemeanor charge for "Assault 3rd Degree" with a disposition date of January 19, 1999;
60. A misdemeanor conviction for "Larceny 6th Degree" with a disposition date of January 19, 1999;
61. A conviction for "Simple Trespass" with a disposition date of January 19, 1999;

**Case Number F02B-CT-99-0147631S:**
62. A misdemeanor conviction for "Criminal Impersonation" with a disposition date of April 27, 1999;
63. A misdemeanor conviction for "Disorderly Conduct" with a disposition date of April 27, 1999;
64. A misdemeanor conviction for "Breach of Peace 2nd Degree" with a disposition date of April 27, 1999;
65. A felony conviction for "Escape 1st Degree" with a disposition date of April 27, 1999;

**Case Number F02B-CR-99-0148703S:**
66. A misdemeanor conviction for "Larceny 5th Degree" with a disposition date of May 4, 1999:
67. A misdemeanor conviction for "Larceny 6th Degree" with a disposition date of May 4, 1999:[3]
68. A conviction for "Violation of Probation" with a disposition date of May 4, 1999:
69. A misdemeanor charge for "Larceny 5th Degree" with a disposition date of May 4, 1999:
70. A conviction for "Violation of Probation" with a disposition date of May 4, 1999:
71. A felony conviction for "Risk of Injury to Child" with a disposition date of May 4, 1999:
72. A misdemeanor charge for "Assault 3rd Degree" with a disposition date of May 4, 1999:
73. A felony conviction for "Assault 2nd Degree" with a disposition date of May 4, 1999:
74. A misdemeanor conviction for "Assault 3rd Degree" with a disposition date of May 4, 1999:

**Case Number F02B-CT-99-0149894S:**
75. A felony conviction for "Sale of Certain Illegal Drugs" with a disposition date of June 25, 2001;

---

[3] Plaintiff acknowledges that he was convicted of one count of misdemeanor "Larceny 6th Degree" in association with case number F02B-CR-99-0148703S. However, Defendant's reporting made it appear as though Plaintiff was convicted of two counts of misdemeanor "Larceny 6th Degree" which is not true.

- 11 -

**Case NumberF02B-CT-99-0153216S:**
76. A misdemeanor conviction for "Larceny 6th Degree" with a disposition date of October 29, 1999;
77. A misdemeanor conviction for "Larceny 6th Degree" with a disposition date of October 29, 1999;
78. A conviction for "Violation of Probation" with a disposition date of October 29, 1999;
79. A misdemeanor conviction for "Failure to Appear 2nd Degree" with a disposition date of October 29, 1999;
80. A misdemeanor conviction for "Forgery 3rd Degree" with a disposition date of October 29, 1999;
81. A misdemeanor conviction for "Disorderly Conduct" with a disposition date of October 29, 1999;
82. A conviction for "Creating a Public Disturbance" with a disposition date of October 29, 1999;
83. A misdemeanor conviction for "Forgery 3rd Degree" with a disposition date of October 29, 1999;

**Case Number F02B-CT-00-0162816S:**
84. A misdemeanor conviction for "Assault 3rd Degree" with a disposition date of October 14, 2004;
85. A felony conviction for "Burglary" with a disposition date of October 14, 2004;
86. A conviction for "Violation of Probation" with a disposition date of October 14, 2004;

**Case Number F02B-CT-00-0163859S:**
87. A felony conviction for "Larceny 2nd Degree" with a disposition date of June 25, 2001;
88. A misdemeanor conviction for "Breach of Peace 2nd Degree" with a disposition date of June 25, 2001;
89. A felony conviction for "Assault 1st Degree- Ser Phys Injry" with a disposition date of June 25, 2001;
90. A conviction for "Violation of Probation" with a disposition date of June 25, 2001;
91. A misdemeanor conviction for "Assault 3rd Degree" with a disposition date of June 25, 2001; and
92. A conviction for "Violation of Probation" with a disposition date of June 25, 2001.

49. Defendant published inaccurate information about Plaintiff. The above-referenced information should not have been included in any tenant screening report about Plaintiff.

50. Specifically, it is indisputable that prior to furnishing the report about Plaintiff to Raintree, Defendant failed to consult widely available public court records in Connecticut, which indicate that Plaintiff was **not** charged with or convicted of the aforementioned charges.

51. Had Defendant actually consulted or obtained the widely available underlying public court records, it would have seen the obvious discrepancies between Plaintiff's actual criminal history and the criminal history reported by Defendant in the tenant screening report it prepared for Raintree. Namely, that Defendant was reporting ninety-two (92) charges (and convictions) which do not belong to Plaintiff.

52. Defendant's reporting gave the appearance that Plaintiff had been charged with and/or convicted of ninety-two (92) felonies and misdemeanors that he was never charged with or convicted of.

53. The sole reason the inaccurate criminal charges were reported as belonging to Plaintiff was that Defendant failed to follow reasonable procedures to assure the maximum possible accuracy of the information it published within the tenant screening report it sold about Plaintiff to Plaintiff's prospective landlord.

54. Had Defendant followed reasonable procedures, it would have discovered that the inaccurate and stigmatizing criminal charges do **not** belong to Plaintiff.

55. In preparing and selling a consumer report about Plaintiff, wherein Defendant published to Plaintiff's prospective landlord inaccurate information about Plaintiff, Defendant failed to follow reasonable procedures to assure that the report was as accurate as maximally possible, in violation of 15 U.S.C. § 1681e(b).

**Raintree Denies Plaintiff's Housing Application**

56. On or about May 23, 2023, Raintree requested that Plaintiff stop by the leasing office.

57. Plaintiff did not know why he needed to stop by the leasing office in-person.

58. Once there, Raintree verbally told Plaintiff that his housing application was denied based on his background check.

59. Plaintiff was confused; he didn't understand why his application was rejected since he knew that Raintree accepted convicted felons.

60. Plaintiff also noticed that Raintree's attitude towards him had changed. At first, Raintree seemed willing to work with Plaintiff even though he had his own criminal records. However, Raintree now seemed dismissive and were talking down to him.

61. Raintree then told Plaintiff that his background check revealed a conviction that was sexual in nature.

62. Plaintiff was extremely embarrassed, upset, and appalled as he has never been charged with or convicted of any crime that was sexual in nature. Plaintiff acknowledges that he made mistakes in the past, but he is certainly **not** a sex offender.

63. Raintree also told Plaintiff that there were a lot more criminal records appearing on the report than Plaintiff had disclosed.

64. Shortly thereafter, Plaintiff called Defendant to dispute as will be discussed in greater detail below.

65. Plaintiff then contacted Raintree to inform them of his dispute. Raintree informed Plaintiff that it was closing his application, but that he could re-open his application if the inaccurate records were removed.

**Plaintiff Disputed the Misinformation in Defendant's Tenant Screening Report**

66. In or around late-May 2023, desperate to secure housing with Raintree and riddled with worry over the far-reaching impacts of the inaccurate information, Plaintiff called Defendant.

67. During Plaintiff's call with Defendant, Plaintiff identified himself and inquired as to what criminal records were appearing on his report and disputed the inaccurate information with Defendant.

68. Plaintiff and Defendant's representative went through the records on the report one by one, and Plaintiff provided information to support his dispute.

69. Plaintiff specifically disputed the inaccurate reporting of the criminal charges that do not belong to him.

70. Plaintiff specifically asked Defendant to investigate and delete the criminal charges that do not belong to him from any tenant screening report about Plaintiff.

71. Plaintiff also told Defendant that the inaccurate information, specifically the "Sexual Assault" conviction was impacting his ability to secure housing with Raintree, and asked if Defendant could provide a report as soon as possible without the "Sexual Assault" conviction so that Plaintiff could try to get approved by Raintree while Defendant continued investigating the remaining inaccurate charges.

72. While Defendant initially informed Plaintiff that it could provide such a revised report, when Plaintiff called to follow up a few days later, Plaintiff was informed that he would have to wait thirty days for a revised report.

73. Plaintiff was shocked and disappointed; he didn't understand why it would take so long to investigate. Plaintiff's lease was also set to expire, and he had already given his current landlord notice.

74. Plaintiff also feared that he would be unable to secure housing elsewhere and rendered homeless due to Defendant's inaccurate reporting. Plaintiff could not afford to keep applying to apartments just to be denied and lose out on additional application fees.

75. Accordingly, Plaintiff contacted his current landlord to see if another unit was available while Defendant reinvestigated.

76. Shortly thereafter, Plaintiff acquired a copy of the tenant screening report Defendant sold to Raintree.

77. Plaintiff was even more concerned than before. Plaintiff was overwhelmed and stressed to see the sheer amount of inaccurate criminal charges on his report, which spanned dozens of pages.

78. Plaintiff also began to fear that his identity was stolen.

**Defendant Fails to Conduct a Reasonable Reinvestigation and Correct Plaintiff's Tenant Screening Report**

79. On or about June 20, 2023, Defendant sent a letter to Plaintiff confirming that it had completed its reinvestigation of Plaintiff's dispute.

80. Defendant failed to issue a corrected tenant screening report to Raintree.

81. Plaintiff was baffled, angry, and frustrated. He did not understand why Defendant failed to correct its inaccurate reporting.

82. Despite Plaintiff's dispute, Defendant failed to conduct a reasonable reinvestigation of Plaintiff's May 2023 dispute and failed to delete the disputed information in violation of 15 U.S.C. § 1681i(a)(1)(A).

83. In fact, Defendant deleted only **one** entry from the report, and the entry it deleted was not one of the ninety-two (92) inaccurate charges; the deleted entry was a fare violation that does in fact belong to Plaintiff.

84. Because Defendant failed to issue a corrected tenant screening report, Raintree did not reconsider its decision to deny Plaintiff's housing application.

85. Upon information and belief, had Defendant corrected its reporting, or reported inaccurate information in the first place, Plaintiff's rental application would have been approved by Raintree. Further, Plaintiff would have been spared the humiliation, embarrassment, anxiety, frustration, and stress caused by Defendant's inaccurate reporting.

86. Defendant's false report cost Plaintiff a housing opportunity that met his needs; including those attendant to affordability, safety, proximity to work, and that was properly maintained.

87. Plaintiff was especially looking forward to living at Raintree because Raintree was well cared for and maintained, Raintree's rent was cheaper per month, Raintree was closer to his work, Raintree was a gated, and Raintree had better amenities, including a pool that actually had water in it.

88. Due to Defendant's unreasonable procedures and shoddy, if any, dispute reinvestigation, Plaintiff was denied housing by Raintree. Further, Plaintiff faced homelessness as he had already given notice at his current apartment given the significant maintenance issues. Plaintiff also feared that if he did apply elsewhere, he would lose out on

additional application fees and be denied by other apartments due to Defendant's inaccurate reporting.

89. Accordingly, Plaintiff was left with no other option but to negotiate with his current landlord for another unit within his complex. While Plaintiff was ultimately able to secure another unit, Plaintiff was still dismayed as the complex left much to be desired and he had been looking forward to moving out.

90. negotiate and move in his previous apartment complex that he was trying to leave because of maintenance issues.

91. The injuries suffered by Plaintiff as a direct result of Defendant's erroneous reporting are the type of injuries that the FCRA was enacted to address. Under common law, Defendant's conduct would have given rise to causes of action based on defamation and invasion of privacy.

92. As a result of Defendant's violations of the FCRA, Plaintiff has suffered a range of actual damages including, without limitation, loss of housing opportunities; loss of time trying to correct the tenant screening report; wasted money; damage to his reputation; loss of sleep; lasting psychological damage; loss of capacity for enjoyment of life; and emotional distress, including mental anguish, anger, anxiety, fear, frustration, humiliation, and embarrassment.

**CLAIMS FOR RELIEF**
**COUNT I**
**15 U.S.C. § 1681e(b)**
**Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy**

93. Plaintiff re-alleges and incorporates by reference the allegations set forth in the preceding paragraphs as if fully stated herein.

94. Defendant is a "consumer reporting agency" as defined by 15 U.S.C. § 1681a(f).

95. At all times pertinent hereto, Plaintiff was a "consumer" as that term is defined by 15 U.S.C. § 1681a(c).

96. At all times pertinent hereto, the above-mentioned tenant screening report was a "consumer report" as that term is defined by 15 U.S.C. § 1681a(d).

97. Defendant violated 15 U.S.C. § 1681e(b) by failing to establish or to "follow reasonable procedures to assure maximum possible accuracy" in the preparation of the tenant screening report it sold about Plaintiff as well as the information it published within the same.

98. As a result of Defendant's violations of the FCRA, Plaintiff has suffered a range of actual damages including, without limitation, loss of housing opportunities; loss of time trying to correct the tenant screening report; the expenditure of labor and effort disputing and trying to correct the inaccurate reporting; wasted money; damage to his reputation; loss of sleep; lasting psychological damage; loss of capacity for enjoyment of life; and emotional distress, including mental anguish, anger, anxiety, fear, frustration, humiliation, and embarrassment.

99. Defendant willfully violated 15 U.S.C. § 1681e(b) in that its conduct, actions, and inactions were willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. Alternatively, they were negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

100. Plaintiff is entitled to recover statutory damages, punitive damages, and reasonable attorneys' fees and costs from Defendant in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## COUNT II
## 15 U.S.C. § 1681i
### Failure to Perform a Reasonable Reinvestigation

101. Plaintiff re-alleges and incorporates by reference the allegations set forth in the preceding paragraphs as if fully stated herein.

102. The FCRA mandates that a CRA conducts an investigation of the accuracy of information "[I]f the completeness or accuracy of any item of information contained in a consumer's file" is disputed by the consumer. *See* 15 U.S.C. § 1681i(a)(1). The Act imposed a 30-day time limit for the completion of such an investigation. *Id*.

103. The FCRA provides that if a CRA conducts an investigation of disputed information and confirms that the information is in fact inaccurate or is unable to verify the

accuracy of the disputed information, the CRA is required to delete that item of information from the consumer's file. *See* 15 U.S.C. § 1681i(a)(5)(A).

104. On at least one occasion during 2023, Plaintiff disputed the inaccurate information with Defendant and requested that Defendant correct and/or delete the inaccurate information in the tenant screening report that is patently inaccurate, misleading, and highly damaging to him, namely stating that Plaintiff was charged with and/or convicted of ninety-two (92) charges that do not belong to him.

105. In response to Plaintiff's dispute, Defendant failed to conduct a reinvestigation, or such investigation was so shoddy as to allow patently false and damaging information to remain in the tenant screening report and refused to correct the tenant screening report at issue.

106. Defendant violated 15 U.S.C. § 1681i by failing to conduct a reasonable reinvestigation to determine whether the disputed information was inaccurate; by failing to delete the disputed inaccurate information from the subject tenant screening report; by failing to follow reasonable procedures with which to filter and verify disputed information in Plaintiff's credit file; and by relying upon verification from a source it has reason to know is unreliable.

107. As a result of Defendant's violations of the FCRA, Plaintiff has suffered a range of actual damages including, without limitation, loss of housing opportunities; loss of time trying to correct the tenant screening report; the expenditure of labor and effort disputing and trying to correct the inaccurate reporting; wasted money; damage to his reputation; loss of sleep; lasting psychological damage; loss of capacity for enjoyment of life; and emotional distress, including mental anguish, anger, anxiety, fear, frustration, humiliation, and embarrassment.

108. Defendant willfully violated 15 U.S.C. § 1681i in that its conduct, actions, and inactions were willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. Alternatively, they were negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

109. Plaintiff is entitled to recover statutory damages, punitive damages, and reasonable attorneys' fees and costs from Defendant in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for the following relief:

i. Determining that Defendant negligently and/or willfully violated the FCRA;

ii. Awarding Plaintiff actual, statutory, and punitive damages as provided by the FCRA;

iii. Awarding Plaintiff reasonable attorneys' fees and costs as provided by the FCRA; and,

iv. Granting further relief, in law or equity, as this Court may deem appropriate and just.

## DEMAND FOR JURY TRIAL

Plaintiff is entitled to and hereby demands a trial by jury on all issues so triable.

DATED: August 24, 2023                    Respectfully submitted,

**CONSUMER ATTORNEYS**

*/s/ McKenzie Czabaj*

McKenzie Czabaj, AZ # 036711
David A. Chami, AZ # 027585
Daniel Cohen, AZ #032552
8245 N. 85th Way
Scottsdale, Arizona 85258
T: (480) 626-2376
E: mczabaj@consumerattorneys.com

*Attorneys for Plaintiff*
Brian D'Amico